**UNION PACIFIC RAILROAD COMPANY, et al.,**
**Plaintiffs,**

v.

**CALIFORNIA PUBLIC UTILITIES COMMISSION, et al.,**
**Defendants.**

**No. C 97-3660 TEH.**

United States District Court,
N.D. California.

July 20, 2000.

Maureen E. Mahoney, Latham & Watkins, Washington, D.C., Linda A. Bagley, Latham & Watkins, Menlo Park, CA, Laura McKinney, Environmental Law Foundation, Oakland, CA, Frederick L. Nelson, Oakland, CA, Lawrence M. Mann, Alper, Mann & Weisbaum, P.C., Washington, D.C., for plaintiffs.

Peter Arth, Jr., Mark Fogelman, Patrick S. Berdge, Lionel B. Wilson, Public Utilities Commission of the State of California, San Francisco, CA, Louis P. Warchot, Association of American Railroads, Washington, D.C., Judry L. Subar, Sandra M. Schraibman, U.S. Department of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

HENDERSON, District Judge.

This matter came before the Court on May 1, 2000, on plaintiffs' and defendants' cross-motions for summary judgment. Having carefully considered the written and oral arguments presented by the parties, intervenors, and amicus curiae, and the voluminous record herein, the Court grants in part, and denies in part, the

motions for summary judgment as set forth below.

## FACTUAL BACKGROUND

As explained in our December 10, 1997 memorandum addressing plaintiffs' motion for preliminary injunction, this case has its genesis in two major railway accidents that occurred in 1991. On July 14, 1991, a train operated by the Southern Pacific Transportation Company derailed on the Cantara Loop Bridge near Dunsmuir, California with devastating results. Thousands of gallons of metam-sodium, which becomes highly toxic when mixed with water, spilled into the Sacramento River, killing all fish and vegetation along the river for 40 miles, and causing widespread health problems for area residents. The Sacramento River ecosystem may never recover given that some species were completely extricated from the river. *See* Bagley Decl., Vol. 1, ¶ 2, and appended Administrative Record (hereafter "AR") 2656–57. Two weeks later, on July 28, 1991, a Southern Pacific train was involved in another derailment near Seacliff, California. The release of toxic materials led to evacuations, the closing of a highway for approximately five days, and medical treatment for many. *Id.* at 2657; 57 CPUC2d 368.

The California legislature responded to these and other railroad accidents[1] by directing the California Public Utilities Commission ("CPUC") to identify "local safety hazards" on California railways and to adopt regulations "to reduce the potential railroad hazards" at those sites. *See* CAL. PUB.UTIL.CODE §§ 7711(d), 7712; *see also id.* at § 765.5 (1991) (amended 1999); AR 2644–45. In August of 1991, the CPUC issued an order instituting an investigation into the July 14, 1991 Cantara Loop Bridge derailment. CPUC concluded that the derailment was caused by track-train dynamics, and in particular the configura-

tion of the train cars, which in this case included heavy/light car and short/long car combinations too close to the head-end of the train. *Re Southern Pacific Trans. Co.*, 57 CPUC2d 386, 400–01, 1994 WL 746871 (1994).

In December of 1994, the CPUC issued its decision regarding the Dunsmuir investigation, which found the Cantara Curve to be a local safety hazard. The CPUC issued rules regulating trains traveling over that site, including (1) a requirement that Southern Pacific utilize a state-approved locomotive maintenance quality improvement program; and (2) a requirement that trains operating over the Cantara site be configured in a specific manner. *See* Decision No. 94–11–069 at 403–06 (hereinafter "Dunsmuir Decision").

Meanwhile, in March of 1992, the CPUC issued an order instituting an investigation into potential railroad safety hazards in California generally. *See* Order Instituting Investigation No. 92–03–17. AR 12–44. On September 3, 1997, the CPUC issued a 174-page decision, 97–09–045, which identified 19 sites, located in and around California mountains, as "local safety hazard sites" and adopted numerous regulations governing operations at these sites. AR 2640–2817 (hereafter "Decision"). Among other things, the CPUC's order required the railroads to: (1) cooperate in developing performance-based standards for train configuration based on track-train dynamics principles; (2) develop standards for dynamic braking systems; (3) equip trains with two-way end-of-train telemetry devices; (4) institute new training programs regarding track-train dynamics principles; (5) install trackside defect detectors at 30 mile intervals; (6) adopt heightened standards for securing standing trains; (7) maintain current track strength at one particular site; and (8) not discipline rail-

---

1. On May 12, 1989, for example, a runaway train derailed near San Bernardino, California at the bottom of the Cajon Pass, killing four people, destroying seven homes and seriously damaging four other homes. A subse-

quent fire attributable to the accident also killed two more people and destroyed 11 more homes. AR 2644; Nov. 5, 1997 Berdge Decl., Exh. E.

road employees who report violations of the new regulations (the "whistleblower rule"). The Decision explained that:

> [W]e implement these regulations not out of any sense of competition or dissatisfaction with the [Federal Railroad Administration ("FRA") ] but, rather, out of sheer necessity to protect California's people, its environment and its commerce against the disastrous consequences of recent rail accidents and toxic spills. In issuing this Decision, we intend to complement the FRA's efforts and hope that both the Railroads and the FRA will join us in securing greater safety and fewer accidents in railroad operations in this state."

*Id.* at 2.

On October 9, 1997, plaintiffs Union Pacific Railroad ("Union Pacific"), Southern Pacific Transportation Company ("Southern Pacific"), and Burlington Northern and Santa Fe Railway Company ("Burlington Northern")[2] sued to enjoin these CPUC regulations as preempted by (1) the Federal Railroad Safety Act, 49 U.S.C. § 20101 *et seq.;* (2) the Locomotive Boiler Inspection Act, 49 U.S.C. § 20701 *et seq.;* (3) the Safety Appliance Act, 49 U.S.C. § 20301 *et seq.;* (4) the Hazardous Materials Transportation Act, 49 U.S.C. § 5125; and (5) the Commerce Clause of the United States Constitution. Plaintiffs also claimed that aspects of two of the rules violate the First Amendment. Finally, plaintiffs sought to enjoin three state statutes governing railroad safety issues, Calif.Pub.Util.Code §§ 7672(b)–(c), 7672.5, 7673(c), as preempted by the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 *et seq.,* and the Federal Railroad Safety Act, 49 U.S.C. § 20101 *et seq.* Several environmental groups ("the Cantara intervenors")[3] and unions ("the union intervenors")[4] intervened as party defendants.

On November 26, 1997, this Court granted in part and denied in part plaintiffs' motion for preliminary injunction. On December 14, 1998, this Court granted partial summary judgment on some of the preemption issues presented by this action, holding that (1) Calif.Pub.Util.Code § 7672.5 is not preempted by the Hazardous Materials Transportation Act ("HMTA") or the Federal Railroad Safety Act, and (2) that Calif.Pub.Util.Code § 7673(c) is preempted by the HMTA. It also reconfirmed an earlier ruling that Calif. Public Util.Code § 7672(b)–(c) is preempted by the HMTA.

Now the parties move for summary judgment on all but two remaining claims.[5] The Cantara Intervenors have joined in the CPUC's opposition and cross-motion for summary judgment. The Union Intervenors have filed separate papers in support of the CPUC. The United States of America, on behalf of the U.S. Department of Transportation ("DOT") and the Federal Railroad Administration ("FRA"), and

---

**2.** Since the inception of this action, Union Pacific has acquired Southern Pacific, and the companies are being operated on a consolidated basis. Both railroads have retained separate corporate identities as of the filing of plaintiffs' papers.

**3.** The Cantara Intervenors consists of Friends of the River, California Sportfishing Protection Alliance, Sacramento River Preservation Trust, and United Anglers.

**4.** The Union Intervenors consist of the United Transportation Union and the Brotherhood of Locomotive Engineers.

**5.** The Court notes that in the course of the briefing on these motions, both plaintiffs and defendants requested that plaintiffs' challenge to CPUC's regulations concerning train securement be dismissed. *See* Defendants' Reply at 19 ("there are presently no CPUC regulations concerning train securement … and these issues are not sufficiently developed to permit a determination concerning preemption"); Plaintiffs' Reply to DOT brief at 15 (Railroads join in CPUC's request to dismiss this claim without prejudice). Accordingly, plaintiffs' claim regarding train securement shall be dismissed without prejudice. With respect to the final two remaining claims (plaintiffs' first amendment and "whistle blower rule" claims), the parties recently resolved them by way of stipulation. *See* June 20, 2000 Stipulation and Order.

the Association of American Railroads have also submitted briefs as amicus curiae.

## DISCUSSION

### I. PREEMPTION BY FEDERAL STATUTE OR REGULATION [6]

 Under the Supremacy Clause, Congress may supplant state regulation with uniform national rules. *Law v. General Motors, Corp.*, 114 F.3d 908, 909 (1997). "Given the importance of federalism in our constitutional structure, however, we entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects—like health and safety—'traditionally governed' by the states." *Id.* at 909–10. Accordingly, a finding of preemption must rest on the clear and manifest purpose of Congress. *Id.* at 910.

 Congress has addressed the issue of railroad safety and equipment in the three statutes at issue in these motions—the Federal Railroad Safety Act ("FRSA"), the Locomotive Boiler Inspection Act ("LBIA"), and the Safety Appliance Act ("SAA")—and delegated the administration of these laws to the Secretary of Transportation, who in turn has delegated implementation authority to the FRA, an operating administration within DOT. *See* 49 U.S.C. § 20103; 45 U.S.C. § 431; 49 C.F.R. § 1.49(n); *CSX Transp. v. Easterwood*, 507 U.S. 658, 662, 113 S.Ct. 1732,

123 L.Ed.2d 387 (1993). Together, these laws and their implementing regulations create an extensive network of federal railroad regulations; nonetheless, Congress has not occupied the entire field of railway regulation, and states may still promulgate and independently enforce rules in certain circumstances. 49 U.S.C. § 20106; *See also* Bagley Decl., Part II, Exh. E, App. B. at 187 (FRA Report to Congress acknowledging that while uniformity is emphasized by the FRSA, "state regulatory action can often point the way for national standards.")

 In determining the preemptive effect of the FRSA, the LBIA, and the SAA, the Court is, of course, bound by their terms. "First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where, however, the statute is silent or ambiguous, then courts must defer to the agency's permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778. In particular, agency regulations that address a gap left in the statute, or ambiguous provisions, must be given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute. *Id.* at 844, 104 S.Ct. 2778.[7] As

---

**6.** The Court addresses the statutory issues first since it is preferable to reach constitutional issues only where necessary. *See Lorillard v. Pons*, 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978).

**7.** *Chevron* deference does not apply, however, to agency positions that are set forth only in letters, legal briefs or other informal sources. *See e.g. Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1657, 146 L.Ed.2d 621 (2000); *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137, n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (declining to give agency interpretation deference under *Chevron* because, *inter alia*, it "does not appear to be embodied in any regulation or similar binding policy

pronouncement to which such deference would apply"); *Smiley v. Citibank*, 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("Of course we deny deference 'to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.' [citation omitted]. The deliberateness of such positions, if not indeed their authoritativeness, is suspect."); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("[W]e have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question"). 1 K. Davis & R. Pierce, Administrative Law Treatise § 3.5·(3rd Ed.1994).

to the preemptive effect of *regulations* promulgated under the FRSA, LBIA or SAA, it is established that "[a]n agency's "interpretation of the preemptive effect of its regulations is entitled to deference where Congress has delegated authority to the agency, the agency's interpretation is not contrary to a statute, and agency expertise is important to determining preemption." *Industrial Truck Assoc., Inc. v. Henry,* 125 F.3d 1305, 1311 (9th Cir.1997). With these general principles in mind, the Court turns to the specific statutes and regulations at issue in this case.

### A. THE FEDERAL RAILROAD SAFETY ACT

The most recent Congressional enactment in the area of railroad operations—the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq.—was adopted in 1970 as a supplement to the Safety Appliance Act and the Locomotive Boiler Inspection Acts which were passed in 1915 and 1911 respectively. Explicitly addressed to the issue of safety, the FRSA's stated purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *CSX,* 507 U.S. at 661, 113 S.Ct. 1732; *Southern Pac. Transp. Co.,* 9 F.3d 807, 812 (9th Cir.1993) (FRSA was enacted "to reduce railroad-related accidents and deaths and to improve rail safety more generally"). It also declares that the rules and laws regulating railroad safety should be "nationally uniform to the extent practicable." 49 U.S.C. § 20106.

Congress balanced these objectives by expressly reserving a role for state regulation in the area of railroad safety in two circumstances. First, a state may adopt any railroad safety rule if there is no federal regulation "covering the subject matter of the state requirement." Second, even where federal regulation already "covers" the subject matter, a state may enforce a more stringent rule if it can demonstrate that it is necessary to address a local safety hazard, is not incompatible with fed-

eral law, and will not unreasonably burden interstate commerce:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106. In short, "[u]nder [the FRSA] ... scheme ... state regulations can fill gaps where the Secretary has not yet regulated, and it can respond to safety concerns of a local rather than national character." *Burlington N. and Santa Fe Ry. Co. v. Doyle,* 186 F.3d 790, 795 (7th Cir.1999). Thus, in order to prevail on their claim of FRSA preemption, plaintiffs must establish both (1) that the "subject matter" of the challenged rules has already been "covered" by the FRSA, and (2) that the "local safety hazard" exception does not apply.

### 1. Whether the FRSA "covers" the "subject matter" of the CPUC rules

■ It is well established that FRSA regulations do not "cover" the subject matter of a state rule by simply "touching upon" or "relating to" the subject matter; rather, "cover" is a more restrictive term that only applies if the federal regulations *substantially subsume* the subject matter of the relevant state law. *CSX,* 507 U.S. at 664, 113 S.Ct. 1732 (emphasis added); *see also Norfolk Southern Railway Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 1473, 146 L.Ed.2d 374 (2000); *Southern Pac. Transp. Co.,* 9 F.3d at 812. Indeed, the Ninth Circuit has observed that the

term "covering" is employed within a provision that "displays considerable solicitude for state law," and notes that FRSA preemption is "even more disfavored than preemption generally." *Id.*

With respect to characterizing the "subject matter" of the state rule, courts must look to the safety concerns that the state law addresses. *Burlington Northern R.R. v. Montana,* 880 F.2d 1104, 1106 (9th Cir. 1989) ("[The FRSA] preempts all state regulations aimed at the same safety concerns addressed by FRA regulations"). As courts have acknowledged, if the subject matter of the state rule is too narrowly defined, a state law could only be preempted if there were an identical federal regulation, which is not what Congress intended. *See Burlington Northern,* 186 F.3d at 796. On the other hand, an overly broad characterization of the subject matter— e.g. "rail safety"—would render the analysis meaningless because all FRA regulations cover this concern. *See id.*

Each rule challenged under the FRSA is addressed in turn below.

### (a) *CPUC Rules on Track—Train Dynamics*

■ Train-track dynamics ("TTD") is a broad area covering almost any subject that affects a train's ability to remain on the tracks (aside from a collision). *See* King Decl. at ¶ 8. It generally refers to the interplay of forces between a train and the track on which it is traveling, and covers a broad range of issues from track geometry to speed limits and train handling techniques. The CPUC TTD rule is focused on one element of TTD—the issue of train configuration or "make-up." As the DOT explains, train configuration or "make-up" focuses on the order in which a train is assembled, "with consideration for the rel-

ative weight and dimensions of the various vehicles that make it up in order to facilitate proper train handling when braking, on heavy grades, and on curves ..." DOT brief at 9. Specifically,

> Train make-up ... involves placing cars in a train such that they balance the forces within the train. Here, relevant considerations include empty versus loaded cars, short versus long cars, and the effects of terrain and curvature.

Bagley Decl., Part II, Exh. E at 67 (FRA report to Congress).

There are currently no federal train make-up rules. Rather, train make-up is governed by the railroads' own operating rules. The CPUC Decision imposes three discrete TTD train make-up rules. First, it requires the railroads to cooperate with CPUC staff and others in developing and implementing performance-based train make-up standards for 13 identified local safety hazard sites.[8] Second, it requires the railroads to comply with their own train make-up rules for these sites as set forth in their internal operating rules. Third, it orders the railroads to obtain CPUC approval before making any changes to these rules. *See* Decision at 168–70, ¶¶ 1–11; App. A3–A4; King Decl. at 3–5. Plaintiffs argue that all three rules are preempted by the FRSA.

### (i) *CPUC rule requiring Railroads to cooperate in developing and implementing train make-up standards for 13 sites*

Plaintiffs argue that FRA rules already cover the subject matter of TTD through a variety of related measures that address various aspects of TTD, such as train speed and Lateral to Vertical (L/V) force ratios. As DOT makes abundantly clear, however, *"the FRA has not issued a rule or order on train make-up"*—the specific aspect of TTD at issue here. DOT brief at

---

**8.** Although this rule, on its face is not limited to a particular rail line or location, when read fairly in context with its supporting rationale and other provisions of the TTD rule, it is clear that this requirement is intended to apply to 13 designated sites. *See* Decision at 152,

¶ 63 (TTD regulations are necessary for site Nos. 1, 3, 4, 7, 9, 12, 16, 22, 23, 26, 28, 29, and 31 given incidence of TTD and TTD-related accident causes at those locations); *Id.* at 169 ¶¶ 7–8.

14; *see also id.* at 13, n. 7 ("No such federal standard exists with regard to track-train dynamics"); *id.* at 12 ("the state is free to regulate track-train dynamics by establishing state standards [consistent with any commerce clause constraints]"); Elsmore Decl. at ¶ 5, p. 4 and Exh. 3 (FRA's Operating Practices Compliance Manual) ("NOTE: There are no Federal regulations governing train make-up, except for train placement of certain hazardous materials cars."); Elsmore Suppl.Decl. ¶¶ 6–8; Bagley Decl. Part II, Exh. E at 67 (FRA report to Congress noting that FRA *will launch* formal regulatory action in the area of train make-up in 1996). As of yet, however, no such rulemaking has been initiated. *See* King Decl. at ¶ 12.[9]

Plaintiffs also argue that the FRA has already explicitly considered and rejected the notion of mandating specific train make-up rules. They emphasize that in 1982, the National Transportation Safety Board ("NTSB") recommended that FRA adopt track-train dynamics rules but the FRA declined. *See* 47 Fed.Reg. at 32,818 (stating that FRA "does not plan to issue regulations pertaining to train make-up or train handling."). This affirmative decision not to regulate, they contend, preempts any state action in the area of TTD. While it is certainly true that FRA's "rejection, like its adoption, of particular safety regulations may preempt state regulations on the same subject matter," *Burlington N.R.R.*, 880 F.2d at 1107, this Court agrees with DOT that "FRA has not taken any action that would amount to negative preemption in this area." DOT brief at 14. First, as DOT notes, the NTSB recommen-

dations pertained to trains carrying hazardous materials. *See* DOT brief at 14 (NTSB recommendations were made "in the hazardous materials context"); 43 Fed. Reg. 35,563, 35,564, 59,557, 59,558 (1978) (discussing issue in context of cars carrying hazardous materials). Second, as DOT explains:

FRA's decision not to adopt train make-up rules in 1982 did not constitute an affirmative determination that such regulation was not needed and that relevant requirements should not be imposed by the States. Instead, FRA concluded that it did not then know how to regulate train make-up effectively and that safety would be better served through other actions FRA could and did take.

DOT brief at 14–15.

Because the FRA has not substantially subsumed, and thus has not covered, the area of train make-up, the FRSA does not preempt CPUC's order that the railroads cooperate with CPUC staff and others to develop performance-based standards for train configurations based on current track-train dynamics principles. Indeed, plaintiffs have fallen far short of establishing that it would be impossible to develop train make-up standards that would not be covered by the FRSA. *Compare infra* section I(B)(2) (finding that CPUC rule requiring plaintiffs to help develop dynamic brake rule is preempted because any such rule would necessarily be preempted).

*(ii) CPUC rule requiring CPUC approval of changes to railroads' train make-up operating rules at the 13 sites*

In contrast to the subject of train make-up, which the FRA has yet to regulate, the

9. Plaintiffs' focus on the FRA's mandatory L/V (lateral to vertical force) ratios in its track standards for track classes 7, 8, and 9, *see* 49 C.F.R. § 213.333, (none of which are present in California), is misplaced. *See* DOT brief at 14, n. 8 ("We do not believe that that federal rule [49 C.F.R. § 213.333] provides any basis for preemption of the current CPUC rule [regarding TTD train make-up]"). First, CPUC has not issued any L/V performance standards. Second, the term L/V applies to a broad category of safety issues. One regula-

tion on one aspect of L/V involving high speed track geometry standards does not "substantially subsume" the area of train make-up. *See also* Pendleton Decl. at ¶¶ 3, 8–9. The Court also notes that while federal regulation covers the subject of train speed, *see* 49 C.F.R. § 213.9(a), the same is not true for train length or train configuration. 49 C.F.R. §§ 174.84 and 174.85, upon which plaintiffs rely, only affect the configuration of trains that contain hazardous materials.

FRA has acted in the area of railroad operating rules. Specifically, 49 C.F.R. §§ 217.7–11 requires that the railroads (1) file copies of their operating rules with the FRA, (2) conduct their own self-monitoring tests and inspections to determine compliance with their operating rules, (3) keep records of and report annually on those self-monitoring tests and inspections, and (4) periodically train their employees on the operating rules. FRA regulations do not, however, mandate the *content* of the rules (except for a few very limited exceptions, *see e.g.* 49 C.F.R. §§ 218–219; Elsmore Decl. at ¶ 24); nor do they require that the rules be approved by the FRA.

By virtue of the fact that the FRA does not, with minor exception, regulate the *content* of the railroads' internal operating rules, the FRA has effectively deferred to the railroads with respect to the content of the rules (subject of course to any governing federal regulation). This deference in turn necessarily implies that FRA has also determined that no approval of railroad operating rules is warranted. Indeed it would be totally inconsistent to defer to the railroads regarding the content of their rules, but then require that the rules, or modifications thereto, be subject to "approval" by the different states.[10] Given the above, this Court concludes that the FRA's regulations governing the railroads' operating rules, set forth in 49 C.F.R. § 217 *et seq.*, "cover" the issue of approval of the railroad's operating rules.

*(iii) CPUC rule requiring that railroads comply with their own operating rules, with respect to train make-up at the 13 sites*

As noted above, the Decision also requires that the railroads comply with their own train make-up rules (as set forth in their own operating rules and related documents) at 13 sites. *See* Decision at 169,

¶ 8. While DOT acknowledges that this rule presents a closer question, it contends that 49 C.F.R. § 217 *et seq.*, described above, does not cover the subject matter of whether railroads may be "required" to abide by their own operating rules. Rather, it submits, 49 C.F.R. § 217 et seq. covers only the more narrow subject of "self-monitoring" by railroads to determine the extent of their compliance with their own rules. DOT brief at 13–14. Under this view, FRA has not covered the issue of whether railroads can be required to comply with their own operating rules.

Plaintiffs emphasize that the safety concern of the CPUC's rule is to promote better train make-up through ensuring compliance with railroads' own rules. They then argue that because the self-monitoring provisions of section 217 are aimed at this same safety purpose of "compliance," it covers the subject of the CPUC rule. While this argument has appeal at first blush, it does not survive closer scrutiny. While the "self-monitoring" requirements in § 217 certainly touch upon and relate to the issue of compliance, it does not appear that the focus of the self-monitoring requirements is to *ensure* that the railroads are complying with their own train make-up rules. Rather, FRA explained that it was requiring the railroads to conduct, and report on, the self-monitoring tests and inspections because "[t]he information to be gained through the implementation of these requirements is considered necessary to the formulation of uniform operating rules." 38 Fed.Reg. 12617, 12618 (May 14, 1973); *see also* Elsmore Decl. ¶ 28.

Indeed, the fact that the FRA takes *no* "compliance-related" action with respect to the self- monitoring information, further suggests that the purpose of the self-monitoring provisions is not to ensure compli-

---

**10.** DOT also cites to 39 Fed.Reg. 41, 176 (Nov. 25, 1974) to support its position that FRA did not intend for railroad operating rules to be subject to approval. However, there, the FRA only decided not to require approval of the railroads' programs regarding self-monitoring and employee training. It did not, as CPUC points out, explicitly reject any proposal would require approval of operational rules.

ance.[11] While reasonable minds could differ on this issue, the FRA's view of the preemptive scope of its regulation is not an unduly narrow or unreasonable one and thus deserves deference. *Industrial Truck Assoc.*, 125 F.3d at 1311. Moreover, the Court is mindful that the "covering" standard is a "stringent" one, and of the general "presumption against pre-emption" in this area. *CSX*, 507 U.S. at 668, 113 S.Ct. 1732; *Southern Pac.* 9 F.3d at 812. Accordingly, this Court concludes that the FRA regulations do not substantially subsume or cover CPUC's rule requiring the railroads to comply with their own train make-up rules at 13 sites.

In sum, this Court finds, with respect to the train make-up rules, that (1) CPUC's order requiring the railroads to cooperate in the development of train make-up rules is not covered by the FRSA, (2) CPUC's order requiring approval of changes to the railroads' operating rules is covered by the FRSA, and (3) CPUC's order requiring the railroads to comply with their own train make-up rules is not covered by the FRSA.

### (b) *CPUC Train–Track Dynamics (TTD) Training Rule*

The CPUC's Decision requires that train crews undertake additional training regarding the make-up rules for six sites which pose particularly difficult TTD-related hazards and are subject to specialized train make-up rules. *See* Decision at 171–72 and App. A–4; King Decl. at ¶¶ 122–23 (requiring additional instruction, testing, and periodic certification of employees

with respect to the railroads' train make-up rules for certain sites). As CPUC concedes, the issue of training is addressed by the FRA in 49 C.F.R. §§ 217.11, 240.123, 213. These regulations require that railroads provide initial and periodic instruction for their employees on the railroad's operating rules, to "ensure" the employees' "understand[ing]" of and "meaning and application" of the rules. *Id.* at § 217.11. They also provide standards for the initial and continuing education for locomotive engineers, including education on train handling, operating rules and the physical characteristics of the railroad.[12]

CPUC contends, however, that the FRA regulations are overly general and fail to require needed site-specific training. *See e.g.* Elsmore Decl. ¶ 3, et seq. While defendants may be dissatisfied with the rules, and consider them weak and ineffectual, the question before the Court is not whether the FRA rules could stand improvement, but whether they "substantially subsume" the subject of the state rule, which is defined by the safety concern that it addresses. Given that the safety concern of the CPUC's training rule can be fairly described—not too narrowly and not too broadly—as "training for hazardous sites," the Court concludes that the FRA has covered the subject.

The FRA specifically requires training on all operating rules, which plaintiffs credibly represent to include training on all General Orders, Superintendent's Notices, timetables and special instructions. *See* Paton Decl. ¶¶ 7–11, 23; Paton Suppl.

---

**11.** Plaintiffs misleadingly assert that the FRA adopted the self-monitoring requirements to "insure" that railroad employees "comply with" the company's operating rules, quoting 38 C.F.R. §§ 12617, 12618 (May 14, 1973). However, the quote is taken out of context. The FRA was in fact stating that railroads "must intensify effort to insure that its employees understand and comply with the company's existing operating rules [since many accidents can be attributable to a lack of compliance and understanding of the rules]." This statement was made in the context of explaining the need for the better employee

training—not a statement of the purpose of the self-monitoring requirements. Notably, a rule requiring railroads to comply with their own operating rules would only further the purposes of the training rule.

**12.** *See also* 39 Fed.Reg. 41, 175, 41, 176 (1975) (Noting that while FRA agreed that the training regulations should emphasize complete understanding of all rules and all rule interpretations, it believes that this issue is "adequately covered in the proposed regulation.)"

Decl. ¶ 15; Wills Decl. ¶ 37, Repola Decl. ¶ 10, and Exh. A. As such, the FRA already requires training on the railroads' train make-up rules. *Id.; see also* Quilty Decl. ¶ 9 (BNSF tests on all rules including general orders and system special instructions which address make-up issues); Paton Supp.Decl. at ¶¶ 14–17; Wills Decl. ¶ 25, and Exh. B; 49 C.F.R. § 217.11(a). Notably, the FRA has also expressly delegated the training function to the railroads, subject to intervention by the FRA and state inspectors. *See* 49 C.F.R. § 217.11 ("[E]ach *railroad* to which this part applies shall periodically instruct each such employee on the meaning and application of the railroad's operating rules ...") (emphasis added); Paton Supp.Decl. at ¶ 9.–12. Accordingly, and consistent with the view of the DOT, this Court concludes that the CPUC's training regulation concerns a subject that is already "covered" by federal regulation.

(c) *CPUC Rule on Trackside Defect Detectors ("Hot Box" Detectors)*

Trackside defect detectors (also referred to as "hot box" detectors) are devices attached to railroad tracks that monitor whether passing trains are operating with overheated wheel bearings, a condition that makes train derailment more likely. If the monitor senses that the bearing is overheated, it sends a signal to a dispatcher, wayside display, or the train crew. The CPUC's Decision requires the railroads to install hotbox detectors at intervals of no greater than 30 miles. *See* Decision at 172, ¶ 23. Because the railroads generally place wayside detectors roughly every 30 miles, as a practical matter, this rule only requires Union Pacific to install a single detector near site No. 25 (where no detector is in place for over 60 miles), because all other locations are already in compliance with the 30–mile rule. *See* Decision at 93. While plaintiffs argue that a number of federal regulations already "cover" the subject area of hot-box detectors, in fact they only touch upon, rather than substantially subsume, the subject.

Plaintiffs, for example, argue that the FRA specifically rejected proposals to require hot-box devices in 58 Fed.Reg. 36,-605, 36,607 (1993). There, the FRA issued a final rule requiring event recorders on fast trains that can provide quality information for post-accident investigations. In issuing this rule, the FRA decided that it was not necessary to have hot-box detector data recorded by the event recorders because information regarding hot box detector readings is already available through other sources. *See id.* at 36,607. At best, this FRA rule only "touches" upon the subject as it relates to the issue of event recorders. It certainly does not substantially subsume the question of where hot-boxes should be installed.

Plaintiffs' reliance on 49 C.F.R. § 215.115 is similarly misplaced. That section prohibits railroads from using trains with overheated or defective bearings (which hot-box detectors are intended to identify) and requires that bearings on cars that have been involved in derailments be physically inspected for defects. Thus, while section 215.115 addresses the hazard that results from defective bearings, it does not speak to the use of *proactive* measures, such as hot-box detectors, to detect defective bearings before they become hazardous. Nor does 49 C.F.R. § 238.427(e) assist plaintiffs since it concerns passenger, not freight, trains. Finally, plaintiffs' citation to a FRA Report to Congress under the Hazardous Materials Act is also inapposite. Accordingly, this Court agrees with the DOT that plaintiffs have failed to demonstrate that the subject of trackside defect detectors has been "covered" by the FRSA. As such, this rule is not preempted by the FRSA.

(d) *CPUC Rule on Track Standards*

In 1983, SP upgraded, considerably above federal minimum levels, the strength of its track running across a ten-mile track segment in Site No. 9, which includes the Cantara Loop (site of the 1991

accident near Dunsmuir). The Decision requires Southern Pacific to maintain the track strength at above minimum federal standards and to obtain CPUC approval for any change. *See* Decision at 172–73, ¶¶ 24–27. It is clear that federal regulations substantially subsume the subject of track safety standards. As the DOT aptly describes it, 49 C.F.R. Part 213 sets forth "comprehensive" federal track safety standards. *See* DOT brief at 16. Notably, these standards, recently amended in 1998, specifically address track strength at curves. *See* 63 Fed.Reg. 33,992, 34,006; *see also* 49 C.F.R. § 213.109. In its response to DOT's brief, defendants also concede "that track standards are 'covered' by FRA rules." Defendants' response to DOT amicus at 13. Plainly, CPUC's track standard rule is covered by the FRSA.

### (e) *CPUC Rule on End-of-Train Telemetry Device*

End-of-train telemetry ("EOT") devices monitor and regulate the air brake system on a train. As discussed below this Court concludes that CPUC's rule regarding EOT devices is preempted by the LBIA. As such, it is unnecessary for the Court to also address whether the EOT rule is "covered" by the FRSA, and if so, whether it is nonetheless saved from preemption by the local safety hazard exception. Accordingly, it declines to do so.[13]

### (f) *Summary*

As set forth above, this Court finds that two of the three train make-up rules are not "covered" by the FRSA: (1) CPUC's rule requiring the railroads to cooperate in the development of train make-up rules and (2) CPUC's rule requiring the railroads to comply with their own train make-up rules. In addition, CPUC's rule on trackside defect detectors (the "Hotbox" rule) is not covered by the FRSA. As such, plaintiffs' contention that these rules are preempted by the FRSA must be rejected.

The Court finds, however, that the Secretary has "covered" the subject matter of the following three rules: (1) the rule requiring state approval of changes to the railroads' TTD operating rules, (2) the employee TTD training rule, and (3) the track standards rule. As such, these rules are preempted by the FRSA unless defendants can establish that they are saved by the local safety hazard exception, which issue the Court turns to below.

### 2. *Whether the "Covered" Rules are Permissible Under the "Local Safety Hazard Exception"*

■ As described above, even when the Secretary has already "covered" the subject area of the state regulation, Congress provided that a state may still enforce an "additional or more stringent law, regulation, or order related to railroad safety, when the law, regulation, or order (1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce." 49 U.S.C. § 20106.

As discussed below, this Court finds, with respect to the three rules that are covered, that defendants have not demonstrated that the rules requiring (1) additional training on make-up rules affecting six identified local safety hazard sites, and (2) state approval of changes to the railroad's make-up rules, are "necessary" to eliminate or reduce an essentially local

---

**13.** The Court, notes, however, that it would appear that the 2–way EOT rule is clearly "covered" by the FRSA, although plaintiffs did not properly advance this argument in their briefs. As noted by the DOT, regulations under the FRSA address in detail the subject of two-way EOTs and when such devices are required to be used. 49 C.F.R. § 232.21–23.

*See also Burlington N.R.R. Co. v. Montana,* 805 F.Supp. 1522, 1527 (FRA has adopted rules and regulations covering the subject matter of telemetry devices). The Court expresses no opinion on whether this rule would be saved by the local safety hazard exception.

safety hazard, even assuming *arguendo* that the affected sites qualified as local safety hazards. Accordingly, these latter two rules are preempted by the FRSA. The Court does find, however, that the track standards rule, which affects local safety hazard site No. 9, is saved from preemption under the local safety hazard provision.

(a) *TTD Training Rule*

The Court need not determine whether the six affected sites constitute "essentially local safety hazards," because even assuming *arguendo* this showing could be made, defendants have not established that the additional instruction, testing, and periodic certification requirements they seek to impose are necessary to reduce or eliminate any TTD hazard at those sites. First, defendants simply have not shown that there is a training problem to fix in that they have not demonstrated that railroad employees are in fact failing to follow the specific TTD rules for the sites at issue, or that deviation from those rules are causing derailments at the affected sites.

Second, even assuming *arguendo* that the current federally-mandated railroad training programs [14] are not satisfactorily covering the special TTD rules for the six sites,[15] defendants have not satisfactorily shown that a separate state-imposed training program is necessary to address the problem. Rather, under the federal system in place, CPUC has the authority to inspect and monitor the railroad's training programs. If problems are identified, it can seek corrective and other enforcement action. *See* 49 C.F.R. § 212.115; Paton Decl. ¶¶ 12–14; Paton Suppl.Decl. at ¶ 11; Wills Decl. ¶¶ 41–43. CPUC admits, however,

that it has never initiated any enforcement proceedings on the ground that training regarding train make-up is inadequate. *See* Bagley Decl., Exh. K at 13–14; Repola Decl. ¶ 13. Because defendants have never attempted to address their training concerns through the existing federal framework, they can not show that imposition of a supplemental state training program is necessary. Accordingly, CPUC's TTD training rule is preempted by the FRSA.

(b) *Rule Requiring CPUC Approval of Changes to TTD Operating Rules*

As noted above, California has reserved to itself the power to veto or approve any changes in the TTD train make-up rules affecting 13 identified local safety hazard sites. *See* Decision at 169, ¶¶ 8–9 and Appendix A. Again, however, even assuming *arguendo* that the sites qualify as local safety hazards, California has not demonstrated that the rule is necessary to reduce any TTD-related hazards at these sites. As in the case of training programs, the federal framework already provides a mechanism by which states can oversee the actions of the railroads. Federal and state inspectors are authorized to review railroad operating procedures, including train make-up rules, identify any unsafe or inadequate procedure, and seek corrective action. *See* Paton Decl. ¶¶ 21–23; Paton Suppl.Decl. ¶¶ 16–17. While the parties may disagree as to the efficacy of this system, defendants have not documented deficiencies sufficient to justify finding that a separate state regulatory approval-scheme is necessary to reduce any TTD-related risks at the sites at issue. This is particularly so given that permitting states

---

**14.** As discussed above, under 49 C.F.R. § 217.11(a) the railroads must provide training for employees sufficient to ensure that each employee understands the railroad's operating rules.

**15.** It does not appear that defendants have undertaken any systematic or comprehensive investigation on this issue. They have, however, provided anecdotal evidence indicating

that plaintiffs' training programs do not always address the specialized train make-up rules. *See e.g.* Elsmore Decl. at ¶ 30 ("I have participated in the BNSF Northern California SACP at Stockton, California as a CPUC representative. I have never heard mention of any TTD–TMU rules at the BNSF Northern California SCAP"); *see also id.* at ¶¶ 41–42, 64, 51.

to exercise veto power over changes in railroad operating rules involves a substantial intrusion into the flexibility afforded railroads with respect to their operating rules under the federal scheme. Certainly, a substantially greater showing than that made here would be necessary to justify the overlay of state regulation promulgated by the CPUC. Accordingly, CPUC's rule requiring state approval of any changes to the railroads' train make-up rules for the affected sites is preempted by the FRSA.

### (c) *Track Standards Rule*

As previously described, CPUC's track standard rule requires plaintiffs to maintain the track standard at the Cantara Curve (site 9) at a level exceeding minimal federal standards. In contrast to the rules discussed above, defendants have shown, as explained below, that this rule is "necessary." Accordingly, the Court must confront whether site 9 constitutes "an essentially local safety hazard" and whether the latter two prongs of the local safety hazard provision are met as well.

### (i) *Essentially local safety hazard*

The question of what constitutes an "essentially local safety hazard" raises a number of difficult and sparsely litigated issues. Specifically, the Court must address (1) CPUC's methodology for identifying local safety hazards, (2) the proper definition of an "essentially local safety hazard," and (3) whether site 9 qualifies as a local safety hazard, as that term is properly defined.

### (A) *Methodology for identifying an essentially local safety hazard*

As a threshold matter, plaintiffs and DOT argue that the CPUC's methodology for identifying local safety hazard sites was so deficient that all of the 19 identified local safety hazard sites should be rejected on this ground alone, without the need for any individualized review. This Court concludes, however, that while the methodology has flaws, site 9 should be evaluated on its own merits.

The CPUC began its process by using three independent, statistical methods (the Poisson, binomial, and multinominal models) to verify that accident concentrations at particular locations were not possibly random occurrences but could only be explained by site characteristics. Decision at 26–36. Plaintiffs have not disputed the validity of CPUC's statistical calculations in this proceeding. CPUC then screened the statistically identified sites for accident cause codes that tied the nature of the hazard to the location. King 1st Am.Decl. ¶¶ 59–63. If the causes did not indicate a particular local problem, the sites were dropped from consideration. Decision at 123–143; King Suppl.Decl. ¶¶ 65, 69. CPUC also identified those mountain grade sites in which extreme conditions forced the railroads to follow specially tailored, self-imposed operating restrictions. Decision at 36. Most of these sites overlapped with the sites that were statistically identified. *Id.* CPUC also considered demographic and environmental factors, and other local features. All of the above factors were considered together to make an individualized assessment as to each site. *Id.* at 123–43. Thus, CPUC justified its ultimate decision to designate each of the 19 locations as local safety hazards by explaining the specific combination of factors that, in its view, renders each site to be a local safety hazard. *See* Decision at 120–143. No site was designated because of derailment frequency or operating restrictions alone.

Given the above, plaintiffs' and DOT's contention that CPUC's approach must be rejected because it identified local safety hazards based on accident clusters or operating restrictions alone is based on an oversimplification of CPUC's approach. The argument that the sites are based on grade and curve alone is similarly misleading. *See* King Suppl.Decl. at ¶¶ 71–79. Rather, the record shows that CPUC engaged in and offered an analysis of various factors before designating any site to be a local safety hazard.

DOT also argues that it was inappropriate for California to go out and "search for [local] safety problems across the entire state ..." DOT brief at 21. This Court, however, finds nothing in the FRSA that would prohibit states from taking a proactive approach to identifying genuine, local safety hazards within their borders. Maximizing railroad safety is, after all, the primary purpose of the FRSA, *see* 49 U.S.C. § 20101, and plainly the motivating factor behind the "local safety hazard" savings clause. While the Court is cognizant that to a man with a hammer, many things may look like nails, this concern can be addressed by careful scrutiny of the basis for any state designated local safety hazard. It does not, however, preclude states from making a state-wide assessment of railway lines within their borders to determine the existence, if any, of "essentially local safety hazards." [16]

California's methodology could certainly have benefitted from further refinement, and in many cases CPUC failed to analyze whether the site featured any local conditions or factors that were genuinely uncommon, making the designation of many of the sites questionable. Nonetheless, given all of the above, this Court declines to reject in blanket fashion all 19 of the designated local safety hazard sites. Rather, it concludes that sites should be scrutinized on an individual basis. Accordingly, the Court turns to the question of whether site 9 represents a local safety hazard.

### (B) *Definition of essentially local safety hazard*

As noted above, an essentially local safety hazard is a safety hazard that is not statewide or national in character, but rather addresses a specific local concern. *Doyle*, 186 F.3d at 795. While the case law in this area is relatively sparse, courts have consistently and predictably held that state railroad safety rules that have general state-wide applicability can not survive under the local hazard exception. *See e.g. Coleman*, 542 F.2d at 14–15 (invalidating statewide accident reporting requirements because they were not directed at reducing local safety hazard); *Consolidated Rail Corp. v. Pennsylvania Pub. Util. Comm'n*, 536 F.Supp. 653, 658 (E.D.Pa.1982) (holding that state law requiring all locomotives to have speed recorders and indicators did not relate to "a local problem" and that state can not invoke local safety exception on ground that the state, itself, has a "unique statewide problem"), *aff'd* 696 F.2d 981 (3rd Cir.1982).

Courts have also found that regulations, which on their face, do not apply statewide, but are still too geographically general in scope, will not satisfy the "local safety hazard" exception. For example, in *Union Pacific Railroad Co. v. Public Util. Comm'n of Oregon*, the State of Oregon imposed additional safety requirements on trains operating through local safety haz-

---

**16.** Plaintiffs also argue that CPUC's methodology is fatally flawed because it confined its statistical analysis to data from 1975–1991, while excluding data from 1991–1996. The CPUC concedes that it opted to rely on the 1975–1991 analysis alone, and urges that a follow-up analysis of more recent data would not have significantly affected the outcome, *see* King First Am.Decl. at ¶¶ 64–65, and would have been unworkably expensive and time-consuming. The Court also notes that the analysis underlying the Decision was done in the early 1990s. *See* Decision at 17 and Appendix C. While accident rates have declined in more recent years, in some instances quite significantly because of certain improvements in equipment, the Court is not persuaded that all of plaintiffs' identified local safety hazards should be categorically rejected because plaintiffs statistical analysis did not incorporate the years 1991–1996. Indeed, were the Court to accept plaintiffs' argument, nothing would prevent them from arguing that the CPUC cannot rely on the 1975–1996 data to the exclusion of data from 1997–2000. The Court declines to travel down this slippery slope. The Court would agree, however, that where substantial operational and/or equipment improvements have occurred at a particular site, evidence of recent improvements will certainly be relevant to the inquiry of whether the state rule is still "necessary" to reduce the local safety hazard at that particular site. This, however, involves a site by site analysis.

ards, which were defined as 1) those areas sensitive to hazardous waste materials; 2) gradient areas, 3) urban areas; and 4) railroad-highway grade crossings which have maximum speed limitations. 723 F.Supp. 526, 528 (D.Or.1989). Under this definition, approximately 21 percent of train track in Oregon fell within one or more of the above four categories and thus ran through a local safety hazard. *Id.* (In contrast, all 19 of the California sites comprise 4.2% of all California track. *See* Decision at 5). The Court concluded that the hazards identified were "not peculiar" to either the State of Oregon or parts of the Oregon. Instead they "involve the types of terrain and crossing that commonly occur throughout the national railroad system," and therefore "are for practical purposes statewide." *Union Pacific,* 723 F.Supp. at 530. Similarly, in *Burlington v. Montana,* the district court found that a Montana law that required a two-way telemetry system on all "mountain grades" was not sufficiently local to qualify for the local hazard exception. 805 F.Supp. at 1522. "Mountain grades," the Court observed, "occur in many places of Montana and throughout the nation and are not peculiar to a particular locality." *Id.* at 1528. The Court was also concerned that the "mountain grade" sites were defined administratively (by reference to mile posts in the railroad's timetable and operating rules), and not geographically. *Id.*[17] These rulings

are consistent with the FRSA's legislative history, which makes it clear that local hazards can not be "statewide in character" and that "there is no intent to permit a State to establish Statewide standards superimposed on national standards covering the same subject matter." H.R.Rep. 91–1194 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4104, 4117.

The Court rejects, however, plaintiffs' and DOT's suggestion that the local safety hazard must be "very nearly, if not completely, unique," *see* DOT's brief at 18—at least to the extent that the term "unique" is defined to require a one-of-kind, or virtually one-of-a-kind, hazard.[18] First, the statutory language does not employ the term "unique." Instead, it simply states that the regulation must be necessary to reduce an "essentially" local safety hazard, a more generous term. Notably, while Congress added the term "essentially" to qualify the phrase "local safety hazard," it declined the railroad's invitation to adopt the term "unique." *See Railroad Safety and Hazardous Materials Control Act of 1970:* Hearings on H.R.7068, H.R.14417 and H.R.14478; *Before the Subcomm. On Transp. and Aeronautics of the Comm. on Interstate & Foreign Commerce,* 91st Cong. 2nd Sess., Ser. No. 91–51, p. 100 (April 22, 1970) (proposing that term unique be used to qualify "local safety hazard")."[19] An insistence on true "unique-

---

17. *See also Santini v. Consolidated Rail Corp.,* 505 N.E.2d 832, 838 (Ind.Ct.App.1987) (holding that train speed limit that applied citywide, rather than to specific intersection or location, was too general in scope to constitute a local safety hazard).

18. DOT has issued no formal policy, rule or regulation with respect to the meaning or application of the local safety hazard provision. Nor is DOT charged with adjudicating when a hazard qualifies as an "essentially local safety hazard" for purposes of the FRSA. Instead, Congress left this function for the courts. As such, DOT's position on this point, which is expressed only as argument in its papers before this Court, is not entitled to deference. *See e.g. Christensen,* 120 S.Ct. at 1657.

19. Plaintiffs and DOT also argue that a local safety hazard must, *in addition* to being "very nearly, if not completely unique," be one that is "not capable of being adequately encompassed within uniform national standards," citing *Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman,* 542 F.2d 11, 14–15 (3rd Cir.1976) ("The [local safety hazard] exception was designed instead to enable the states to respond to local situations which are not statewide in character and not capable of being adequately encompassed within uniform national standards"). The phrase "not capable of being adequately encompassed within uniform national standards" appears in the legislative history. *See* H.R.Rep. 91–1194 (1970), *reprinted in* U.S.C.C.A.N. at 4117. It is not clear to the Court, however, what this language meaningfully adds to the existing statutory requirements for a local safety hazard. Literally read,

ness" would effectively eviscerate the exception, a result which is not supported by the legislative history. *See* H.R.Rep. 91–1194, *reprinted in* 1970 U.S.C.C.A.N. at 4117 ("The States will retain authority [pursuant to the local safety hazard provision] to regulate individual local problems where necessary to eliminate or reduce essentially local railroad safety hazards.").[20]

Second, the railroads' argument, that local safety hazards must be truly unique in light of other language in the savings clause, is not convincing. As plaintiffs' vigorously emphasize, the savings clause provides in part that the laws "related to railroad safety shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. While national uniformity is clearly an important objective, the paramount purpose of the Act is railroad safety. 49 U.S.C. § 20101 ("The purpose of this chapter is to promote safety in every area of railroad operations ..."); *see also* H.R.Rep. No. 91–1194, *reprinted in* 1970 U.S.C.C.A.N. at 4104 ("The primary pur-

pose of this legislation ... is to promote safety ..."); *CSX*, 507 U.S. at 661, 113 S.Ct. 1732. Hence, Congress' qualification that the laws relating to railway safety shall be nationally uniform *"to the extent practicable."* In short, the FRSA expresses a desire to achieve both safety, and, to the extent practicable, uniformity—not an intent to trump safety with uniformity. Nor are we persuaded that Congress intended, as plaintiffs suggest, to limit the exception to "industrial or plant railroads." Had this been the intention, it could have stated so quite simply.[21]

Third, the Court agrees with DOT that a site is not a "local" safety hazard simply because an accident occurs there; rather there must be a locally rooted cause. Indeed, every accident occurs somewhere "local," but that does not make it a local safety hazard. The Court disagrees, however, that the locally rooted cause must be limited to some extremely unusual or unique geological anomaly that itself primarily causes an accident.[22] While the

the term capable means possible, and it is *possible* to address almost any situation through a national regulation. *See* King 1st Am.Decl. at ¶¶ 23–3; King Suppl.Decl. ¶¶ 80–81. Thus, literally read, the language could eviscerate the exception. Given the Supreme Court's direction that the savings clauses deserve "considerable solicitude," it would be improper for this Court to inject an additional requirement that would largely if not completely undermine the local hazard exception. Thus, the only reasonable interpretation is that Congress was referring to commonly recurring situations that would most naturally be subject to national, uniform regulation. Such a requirement, however, adds nothing to the existing statutory requirements which clearly preclude regulation of commonly recurring situations that are "statewide" in character. *See* H.R.Rep. 91–1194 (1970), *reprinted in* 1970 U.S.C.C.A.N. at 4117.

20. While the Supreme Court briefly refers to "unique local conditions" in *CSX*, it was intended simply as a contrast to the State's common law of negligence which was clearly not a rule directed at a local hazard in any sense of the term: "The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just

those owing to unique local conditions." 507 U.S. at 674, 113 S.Ct. 1732. Plaintiffs also concede that a "grade crossing"—which was the "local site" of the train-car accident at issue in *CSX*—is a "commonly-occurring condition." *See* Pls' Mtn at 34. Given that the Court was not required to scrutinize in any depth the specific meaning of "essentially local safety hazard," and did not discuss or elaborate on the meaning of the phrase "unique local conditions" the Court concludes that *CSX* is not inconsistent with this Court's consideration of this provision of the FRSA.

21. The reference to industrial and plant railroads in the House Report was made in the context of comparing "rail and gas pipeline safety" issues for the purpose of addressing whether states should be permitted to enforce *federal* regulations. *See* H.R.Rep. 91–1194, U.S.C.C.A.N. at 4109–4110.

22. Notably, DOT offered only one suggestion of a circumstance that might qualify as an "essentially local safety hazard": "The term *may* encompass unique soil conditions in the Eel River canyon in California that are so unstable that they regularly slide out from under the track structure of the railroad.

hazard must be limited to a localized or geographically discrete area, Congress nowhere required that the hazard itself must be viewed solely in terms of unique geology or geography.

Certainly, if an accident happens at a particular location, but for reasons completely unrelated to the location, the accident can not establish the location as a local safety hazard. It is also true, however, that particular and uncommon features of a specific location can substantially increase the risk, and the severity of the risk, even if there is no "unique" geological anomaly present. For example, if a specific stretch of track features an unusually severe grade and curve combination close to an unusually important waterway, or exceptionally densely populated area, it may be much more likely that (a) a bad brake will fail at that *particular* point, and (b) that such an accident will have unusually catastrophic consequences.[23] The fact that it is the "external" bad brake that is a primary cause of the accident, as opposed to some unique geological feature, does not detract from the fact that it is the local conditions that combine—in any common sense meaning of the term—to create an "essentially local safety hazard." [24]

■ Accordingly, this Court concludes that the phrase "essentially local safety hazard" is intended to strike a balance—it encompasses more than a truly unique condition or geological anomaly but plainly less than authority to superimpose statewide regulations. Rather, the phrase is directed at geographically discrete, localized areas that have peculiar or distinctive features or characteristics (or combinations thereof), that are neither typical nor common or otherwise "state-wide" in nature, and which create a safety hazard. Such an approach appears most consistent with both the language and spirit of the FRSA, as well as its legislative history. *See e.g. Monongahela,* 404 A.2d at 1379–80 (finding that state rule imposing special precautions for single blind curve, is "purely local and is designed to reduce or eliminate a purely local safety hazard").[25]

There, the cause of a hazard could be a unique or highly unusual soil condition at the site in question ..." DOT brief at 21 (emphasis in original). The Court notes that CPUC did not designate this site as a local safety hazard that needed further regulation because it is already subject to an FRA emergency order which precludes current operations on the track. 63 Fed.Reg. 67, 976 (FRA Emergency Order No. 21); Decision at 122.

23. While plaintiffs suggest that the severity of the risk is not relevant to whether a location qualifies as a local safety hazard, the Court finds no basis for excluding this consideration which is certainly pertinent to any assessment of a hazard. Indeed, it could well be the case that the FRA would fashion certain safety requirements with "ordinary" risks in mind, whereas the extraordinary nature of the risk at a particular location might make some additional precaution necessary.

24. Notably, in *Monongahela Connecting Railroad Co. v. Pennsylvania Public Utility Commission,* the "cause" of the accident, in which two trains crashed on a blind curve, was human error. 45 Pa.Cmwlth. 164, 404 A.2d 1376, 1381 (1979). "[D]ue to human error, communications between the dispatcher and the train crews failed resulting in a head-on collision between east and west bound trains on the high grade eastbound track." *Id.* at 1381. This "external" cause of the accident did not deter the Court, however, from finding that the blind curve presented an essentially local safety hazard. Indeed, the Court implicitly concluded that the uncommon feature of the "blind curve" at one specific location where trains traveled in both directions, combined with the potentially devastating consequences inherent in any head on collision—whether caused by human error or otherwise—created a local safety hazard. *Id.* at 1379–81. In short, an "external" cause (e.g. a bad brake, human error, improper train make-up) can combine with particularly unusual "local" characteristics to create a peculiarly local, hazardous site. and thus render a particular location a "local safety hazard."

25. As the Court's earlier holdings highlight, however, the existence of a local safety hazard does not automatically validate state regulation of the site. Rather, the state must also demonstrate that the state rule is "necessary to reduce or eliminate" the safety hazard, is not incompatible with federal law, and does not unreasonably burden interstate commerce. 49 U.S.C. § 20106.

*(C)* Site 9 Shasta Line (Black Butte District), Milepost 322.1 to 332.6

■ Site 9, known as the Cantara Loop, is a 10.5 mile stretch of track in the mountains in Northern California starting at a point north of Dunsmuir and ending at a point below Mt. Shasta. This line goes through the Sacramento River Canyon and crosses the river at several locations. This site experienced 32 out of 90 derailments on the line between 1976 and 1991, although there have been no accidents since 1992. Decision at 127; Corrected Site Exhibit Book ("SEB") at site tab 9. "Each statistical method confirms that the chance of the accident concentration at this site occurring randomly is extremely small at less than 1 in a trillion." Decision at 127 (footnote omitted).

The particularly sharp 14 percent curve is the sharpest main line track curve in the state of California. *Id.* at 128. The curve and grade [26] have been directly linked to one-third of the derailments at the site. *Id.* at 127. Track-train dynamics forces also contributed to many other derailments. *Id.* at 128. The most hazardous grade-curve combination occurs on a bridge which crosses over the Sacramento River, a major supplier of the state's water. This resource-critical river is already damaged from the devastating environmental effects of the 1991 Dunsmuir accident which poisoned the river and destroyed its ecosystem for many miles. King Decl. at ¶ 137. The severity of the environmental risk from future accidents can only be described as enormous. Of course, any such risk also necessarily entails serious risks to the physical and economic health of the surrounding communities as well.

While the grade and curve at site 9 may not be unique in the sense that there are a few other curves in other states that are equal to or slightly higher (there is a 16 percent curve in Colorado and 14 percent

curves in Idaho), California need not demonstrate that the grade and curve of the site is uniquely different from every other site in the country. Rather, it must show that the site is a geographically discrete, localized area, that exhibits a combination of peculiar or distinctive features or characteristics (including environmental or demographic features) that are neither typical nor common or otherwise "state-wide" in nature, and which create a safety hazard. Given all of the above, the Court is satisfied that site 9 satisfies this standard and thus constitutes an "essentially local safety hazard."

*(ii)* *Necessity*

The Court is also satisfied that the rule is necessary to reduce or minimize the local safety hazard. Plaintiffs themselves have concluded that strengthening the track is needed to reduce the risk and prevent a return to historically high derailment rates. As an SP representative previously testified during hearings following the 1991 Dunsmuir accident:

As a result of [track strengthening] measures, we developed a much stronger track structure [at site 9], better able to resist sudden lateral transient forces.... The measures that we took to strengthen the track structure, and to help the train engineers in their descending grade train handling, were successful in reducing, and virtually eliminating, the cluster of derailment problems suggested from the FRA statistics.

Decision at 90. *See also id.* at 89, 128.

Plaintiffs argue that the rule is unnecessary because UP, which currently operates the trains over site 9, has voluntarily exceeded the minimum federal standards and there is no evidence that it is likely to abandon this effort. There is no guarantee, however, that the necessary standards will always be voluntarily maintained either by

---

**26.** The grade was changed after the 1991 catastrophic accident from 2.28 degrees to

less than 1 percent.

UP or future operators. Furthermore, the critical inquiry is not whether the current operator asserts an intent to voluntarily comply, but whether the higher track strength is necessary to reduce the local safety hazard.

### (iii) Incompatibility with federal law

California's track standard rule for site 9 is not incompatible with the federal track standards simply because it is more stringent. On the contrary, the FRSA expressly states that the state may adopt a "more stringent law" where necessary to reduce a local safety hazard. 49 U.S.C. § 20106. Plaintiffs, however, argue that the state rule is incompatible with federal track standard rules because the state rule prohibits UP from altering the standards without first obtaining approval. This provision, plaintiffs argue, conflicts with 49 C.F.R. § 213.1(a), which provides in part that federal regulations governing minimum track safety standards are not intended "to restrict a railroad from adopting and enforcing additional or more stringent requirements...." The suggestion that California's rule will somehow prevent plaintiffs from implementing stricter standards is no more than a manufactured conflict. The purpose of the California rule is to promote stricter standards, not prevent them. *See* Decision at 91 ("We assure the Railroads that our regulations will never preclude a Railroad from implementing tougher track standards than the minimum standards we intend to require"). Indeed, the existing track strength exceeds the requirements set forth by CPUC's rule; yet, California has always "accepted this track as being in compliance with the Decision's requirements." Pendleton Decl. ¶ 11.

Plaintiffs also argue that they will be discouraged from making voluntary improvements if such actions could readily lead to mandatory rules. This argument is equally meritless. First, a voluntary effort can only be made mandatory in the event that a state is able to demonstrate that the rule is necessary to reduce or eliminate a local safety hazard. In such a circumstance, the railroad can hardly complain that such a rule should not be mandatory. Second, plaintiffs have made no showing that their hypothetical concern rises to the level of a conflict with a federal rule. Accordingly, this Court finds that the track standard rule is not incompatible with federal law.

### (iv) Unreasonable burden on interstate commerce

Plaintiffs do not contend that the track standards rule will unreasonably burden interstate commerce; nor does the record reflect any such burden. Accordingly, defendants' track standard rule is saved from preemption pursuant to the local safety hazard provision of 49 U.S.C. § 20106.

### 3. Conclusions regarding preemption under the FRSA

In light of the above, the Court finds that the following CPUC rules are preempted by the FRSA because they are covered by federal regulations and do not satisfy the requirements of the local safety hazard savings clause:

(1) Rule requiring CPUC approval of changes to railroad operating train make-up rules

(2) Rule requiring additional training on train make-up rules

The Court finds that the following CPUC rules are not preempted by the FRSA because they are not covered by federal regulations:

(1) Rule requiring railroads to cooperate in developing and implementing train make-up rules based on current TTD principles,

(2) Rule requiring railroads to comply with their own operating rules concerning train make-up

(3) Rule requiring trackside defect detectors (Hot box) Rule

The Court finds that the following CPUC rule is not preempted by the FRSA, although it is covered, because it

satisfies the requirements of the local safety hazard exception:

(1) Track standards rule

## B. THE LOCOMOTIVE BOILER INSPECTION ACT

■ The Locomotive Boiler Inspection Act ("LBIA"), 49 U.S.C. § 20701 *et seq.*, prohibits carriers from using a locomotive unless "the locomotive or tender and its parts and appurtenances ... are in proper condition and safe to operate without unnecessary danger of personal injury ..." 49 U.S.C. § 20701. Although the LBIA is silent as to its preemptive effect, it has long been held to constitute a total occupation of "the field," preempting any state or local regulation on the same subject. *See Napier v. Atlantic Coast Line R.R.*, 272 U.S. 605, 612–13, 47 S.Ct. 207, 71 L.Ed. 432 (1926). The scope of "the field" is governed by the general power delegated by the BIA which extends to "the design, the construction and the material of every part of the locomotive and tender and of all appurtenances," *id.* at 611, 47 S.Ct. 207; *Southern Pac. Transp. Co.*, 9 F.3d at 811, as well as maintenance of locomotives and their parts. 49 U.S.C. § 20701. The purpose of the broad preemptive sweep of the BIA is to maintain nationally uniform equipment standards, so that "locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state." *Law v. General Motors Corp.*, 114 F.3d 908, 910 (9th Cir.1997) (quoting *Southern Pac. Transp. Co.*, 9 F.3d at 811). The Court addresses in turn the CPUC rules challenged under the LBIA.[27]

**27.** The Court does not, however, address any rule challenged under the LBIA that the Court has already found to be preempted under the FRSA.

**28.** To the extent, however, that the CPUC would interpret its rules to require the railroads to use high strength couplers when

### 1. *TTD Train Make-up Rules*

■ The TTD train make-up rules not preempted by the FRSA concern (1) the development of performance based train make-up rules for 13 sites, and (2) compliance with the railroads' own make-up rules for those sites. Although train make-up only concerns the configuration of the train, and not any train equipment, plaintiffs nonetheless contend that all of the train make-up rules are preempted by the LBIA. This argument must fail because the TTD rules at issue do not, as the railroads suggest, force them to use high-strength couplers or otherwise alter the design, construction or material of the trains or their appurtenances; rather, they just affect the number or order of locomotives. *See* King Suppl.Decl. ¶¶ 2–12; King 1st Am.Decl. ¶¶ 82–94;. (CPUC order imposes no limit on size, number or power of trains so long as they are placed in a safe order or configuration). Thus this Court agrees with DOT that the TTD train make-up rules are not preempted by the LBIA.[28]

### 2. *Dynamic Brake Rule*

■ Dynamic brakes operate separately from a train's air brakes and thus provide important braking redundancy. They use the machinery of a diesel-electric locomotive to "burn off" excess speed. The CPUC's Decision requires the railroads to gather information relating to the use of dynamic brakes on trains operating on certain sites and to cooperate and work with the CPUC to develop and implement performance-based standards for dynamic brakes based on total train braking performance criteria. See Decision at 170–71, ¶¶ 12–17. At this point in time, the CPUC has not yet issued any such standards.

exceeding certain maximum trailing tonnage, such couplers are among the safety appliances covered by the SAA, and thus such a requirement would be preempted by that statute. 49 U.S.C. § 20302(a)(1)(A); 49 C.F.R. § 215.123.

CPUC argues that, absent a final rule or regulation, plaintiffs' preemption challenge is not ripe for review. Plaintiffs respond that the matter is ripe because CPUC has mandated that they participate in a process to develop a rule that they assert will necessarily be preempted. This Court agrees. Defendants have been unable to identify any potential regulation of the performance standards of dynamic brakes that would not implicate the design, construction, or material of locomotive equipment. Vague assertions that such a regulation might be "conceivable" do not suffice. As this is the precise field that is totally occupied by the BIA, California can not regulate in this area, even if it ultimately issues a rule that is identical to a federal performance standard. *See Napier,* 272 U.S. at 611–612, 47 S.Ct. 207; *Law,* 114 F.3d at 913; *Southern Pac. Transp. Co.,* 9 F.3d at 811.

In short, CPUC has mandated that plaintiffs devote immediate resources and take certain actions that can only result in an unlawful result. Under these circumstances, plaintiffs have presented a concrete injury that arises independently of final agency action. *Cf. Century Fed., Inc. v. City of Palo Alto,* 579 F.Supp. 1553, 1562 (N.D.Cal.1984) (plaintiff has standing to challenged mandated participation in process alleged to be unlawful and such action is ripe notwithstanding lack of final agency action); *see also Hydro Assoc. v. Maughan,* 985 F.2d 451, 453–54 (9th Cir. 1993). This Court further concludes that since any rule imposing a dynamic brake performance standard rule is necessarily preempted, any rule requiring the development of such a rule must be as well. Accordingly, CPUC's decision requiring plaintiffs to participate in the development

of a dynamic brake performance standard is preempted by the BIA.[29]

### 3. End-of-Train ("EOT") Telemetry Devices

■ A "one-way" EOT device enables an engineer at the head of a train to monitor air brake pressure at the rear of the train. A "two-way" EOT device provides this monitoring capability and additionally enables an engineer at the head of a train to activate air brakes at the rear of the train in an emergency. The FRA currently requires two-way EOT devices on certain trains operating over mountain grades that average 2% or greater for two continuous miles or average 1% or greater for three continuous miles. 49 C.F.R. § 232.23.

The CPUC's Decision requires two-way EOT devices on all trains operating through designated sites Nos. 6 and 25, although neither site meets the criteria set forth in the federal regulation. CPUC Decision at 171. Specifically, the CPUC order provides that:

> all trains operating over local safety hazards Nos. 6 and 25 shall have the means to initiate, from the controlling unit of the locomotive, an emergency brake application at the rear of the train consistent with the [FRA] two-way end-of-train device requirements ... as if the grades at these two sites average two percent or greater....

Decision at 171, ¶ 19.

Plaintiffs argue that CPUC's EOT rule is preempted by the LBIA because it regulates the equipment on a locomotive. CPUC first responds that the LBIA is not applicable to the rear-end EOT braking device because it is currently a portable unit placed on the rear of the train (in

**29.** The Court does not, of course, hold that efforts by the CPUC to require plaintiffs to gather and provide data is preempted where such data is not for the sole purpose of developing dynamic brake performance standards. *See* Defendants' brief at 47 (stating that the fact-gathering provision, *see* CPUC Decision at 170, ¶¶ 12–13, may be used by the CPUC "for the salutary and unassailable purpose of submitting commentary to the FRA [on] power brake NPRMs [Notice of Proposed Rulemakings]"). The Court makes no comment on the use of this data for such a purpose.

contrast to the front-end EOT device which is installed in the cab of the locomotive). This argument is meritless. The fact that the rear EOT device is portable does not, in reality, make it any less a "part and appurtenance" of the locomotive. *See Burlington Northern R. Co. v. Montana*, 805 F.Supp. 1522, 1529 (D.Mont.1992) (two-way telemetry device is a "part or appurtenance" notwithstanding that the actual braking device is located at the rear of the train and not on the locomotive).

CPUC also argues, however, that pursuant to federal regulations, "all of the trains traveling over [sites 6 and 25] will *already carry two-way EOT devices* on them because on the approaches to these sites they must travel over track at speeds greater than 30 mph." Defendant's brief at 49–50 (emphasis added). Accordingly, defendants argue, the CPUC rule does not affect the *type* of equipment on the locomotives but only its *use.*

Plaintiffs do not dispute that all of the trains traveling over the sites in question will already carry the 2–way EOT device. Rather, they simply argue that because the EOT device is a piece of locomotive equipment, the CPUC is barred from regulating it in any manner because the LBIA fully occupies the field of locomotive equipment. There is certainly language in the case law supportive of this position. *See Law*, 114 F.3d at 910 ("It has long been settled that Congress intended federal law to occupy the field of locomotive equipment...."); *Burlington*, 805 F.Supp. at 1529("[LBIA] has been held to totally occupy the field of locomotive equipment regulation"); *id.* (stating that because telemetry devices fall under the "regulatory canopy of the [BIA] ... any state regulation of such devices is absolutely preempted").

The only Ninth Circuit authority that specifically addresses the issue of *use of already-required locomotive equipment*, however, holds that the preemptive force

of the BIA is not as unlimited as the language in some other cases might suggest. Rather, based on its analysis of *Napier*, the Ninth Circuit concluded that the field occupied by the BIA includes the "design, the construction and the material" of every part of the locomotive, but not the *use* of already-required locomotive parts. *Southern Pac. Transp. Co. v. Pub. Util. Comm'n of Oregon*, 9 F.3d 807, 810–11 (9th Cir.1993). This view, the Court noted, was consistent with the policy that locomotive companies "need not be prepared to remove or add equipment as they travel from state to state." *Id.* Accordingly, the Court held that an Oregon law whose only effect was to regulate the *use* (or non-use) of a piece of already-required locomotive equipment was not preempted by the BIA because it "neither limits nor expands the type of equipment with which locomotives are required to be equipped ..." *Id.* at 811. *See also Civil City of South Bend v. Consolidated Rail Corp.*, 880 F.Supp. 595, 602 (N.D.Indiana 1995) (for purposes of LBIA preemption, "[r]egulating the use of equipment is distinct from regulating the equipment") (citing *Southern Pac. Transp. Co.*, 9 F.3d at 807).

Given the above, we can not accept plaintiffs' and DOT's argument that the EOT rule is automatically preempted solely by virtue of the fact that it concerns a piece of locomotive equipment. Moreover, plaintiffs have not disputed that the EOT rule has no effect whatsoever on the design, construction or material of any part of the locomotive equipment that is already required on all trains navigating sites 6 and 25. Thus, if the CPUC rule only addressed the *use* of the 2–way EOT device over sites 6 and 25, the Court would find that the rule was not preempted.[30] As plaintiffs correctly emphasize, however, the rule is not so limited. Rather, it mandates that all trains operating over sites 6 and 25 "shall have the means to initiate, from the controlling unit of the locomotive,

---

**30.** The Court notes, of course, that any such rule could not be invoked to enforce any federal requirement that the equipment be present or in working condition.

an emergency brake application at the rear of the train consistent with the Federal Railroad Administration two-way end-of-train device requirements...." Decision at 171 ¶ 19. The rule as currently fashioned goes well beyond a use regulation and thus is preempted by the BIA.

### 4. *Trackside–Defect Detectors (Hot–Box Detectors)*

■ As explained above, hot-box detectors are devices that attach to the track and monitor the heat of a train's wheel bearings. If the monitor detects an overheated bearing, it sends a signal to a dispatcher, wayside display, or the train crew. CPUC's hot-box rule requires the installation of a hot box detector at site No. 25. Decision at 160–62. This site is on the only stretch of train track that currently does not have such a detector roughly every 30 miles. It consists of a windy "hazardous material route that runs for tens of miles as close as a few yards up a steep rocky bank from the environmentally sensitive 'wild river' Middle Fork of the Feather River, numerous creeks, and other forks of the Feather River." King Amended Decl. at ¶ 46. It is also adjacent to several small towns. Decision at 135–36.

Plaintiffs contend this rule is preempted by the LBIA because part of the detector is installed on the locomotive. In particular, they rely on *Missouri Pacific Railroad v. Railroad Comm'n,* 671 F.Supp. 466 (W.D.Tex.1987), *aff'd* 850 F.2d 264 (5th Cir.1988), which held that a Texas rule requiring that the hot box detector communicate directly with the train's operating crew was preempted by the LBIA because it necessarily required installation of equipment on the train to receive the

signals from the hot-box. California's hot-box rule, however, does *not* require that the hot-box detector communicate directly with the train's operating crew; rather, it affords plaintiffs the option of utilizing signaling systems that do not involve any locomotive equipment. *See* Decl. of King ¶ 44; Decl. of Wills ¶ 70; (describing systems that do not require equipment on the train itself). *See also* DOT brief at 15 ("there are means of detection which would not require equipment on the locomotive to receive the transmission from the detector"). As such, the California rule does not require plaintiffs to alter the materials, design or construction of the locomotive or its equipment. Accordingly, plaintiffs have failed to demonstrate that California's hot-box requirement is preempted by the LBIA.[31]

### 5. *Locomotive Maintenance Quality Improvement Program*

■ The CPUC's Dunsmuir Decision mandates that Southern Pacific implement a state-approved locomotive maintenance program. Specifically, the CPUC requires that:

> "SP shall ... develop, document, implement, and utilize a locomotive maintenance quality improvement program including procedures to ensure compliance with such program."

Dunsmuir Decision at 411, 413–14, ¶4; 57 CPUC2d at 413. CPUC contends that this regulation is needed to ensure plaintiffs' compliance with minimum federal maintenance standards.

As plaintiffs correctly contend, however, this rule is preempted by the LBIA.[32] First it is clear that the power delegated

---

**31.** The Court also notes that since July 1, 1999, the FRA has required that locomotives maintain working radios, as well as backup wireless communication devices. 49 C.F.R. § 220.9. Thus, even were plaintiffs to chose the option of having the hot-box communicate directly with the train crew, this would only involve the *use* of equipment already available on the train. As noted above, the simple use or non-use of already-existing equipment does

not raise preemption concerns. *See Southern Pacific Transp.* 9 F.3d at 810–11.

**32.** Defendants' argument that the lack of final agency action on this matter makes this challenge unripe is rejected for the same reasons discussed above in the section addressing plaintiffs' challenge to CPUC's rule on dynamic brakes.

by the LBIA extends to the issue of maintenance. *See* 49 U.S.C. § 20701(1) – (3) (requiring that locomotives and their parts be "in proper condition and safe to operate," and be "inspected" and "withstand every test" prescribed under this chapter). Accordingly, the maintenance field is occupied, precluding all state regulation. *See Southern Pac. Transp. Co.*, 9 F.3d at 810 (Congress intended to occupy the field as to those powers delegated by the LBIA).

Furthermore, issues of maintenance raise mechanical issues that implicate the state of the equipment itself. *Cf. Baltimore & Ohio Railroad Co. v. Groeger*, 266 U.S. 521, 530, 45 S.Ct. 169, 69 L.Ed. 419 (1925) ("There is a multitude of mechanical questions involved in determining the ... maintenance ... of ... locomotives ... all of which are covered by the [LBIA]"). Consequently, varying state maintenance standards could make equipment that is lawfully operated in one state, unlawful in another. This squarely implicates the central concern of the LBIA preemption doctrine which is to prevent locomotive equipment from being subject to changing standards as trains cross state lines. Accordingly, the Dunsmuir Decisions' maintenance provision is preempted by the LBIA.[33]

## C. THE SAFETY APPLIANCE ACT

■ The Safety Appliance Act ("SAA"), 49 U.S.C. § 20301 et seq., man-

dates that rail cars operate with certain safety equipment and features, including certain types of couplers, brakes, running boards, handholds, and the like. *See* 49 U.S.C. § 20302. While the SAA does not have an explicit preemption provision, courts have held that the SAA fully occupies the field of safety appliances on freight cars, with respect to those devices specifically enumerated in the Act. *See e.g. Jordan v. Southern Ry. Co.*, 970 F.2d 1350, 1352 (4th Cir.1992). Accordingly, it divests states of all authority to regulate on the devices enumerated therein, whether the regulation be "consistent, complementary, additional or otherwise." *Gilvary v. Cuyahoga Valley Ry.*, 292 U.S. 57, 60–61, 54 S.Ct. 573, 78 L.Ed. 1123 (1934); *see also Southern Railway Co. v. Railroad Commission of Indiana*, 236 U.S. 439, 447, 35 S.Ct. 304, 59 L.Ed. 661 (1915).

■ Plaintiffs assert that the CPUC's rule requiring the railroads to develop train make-up rules are preempted by the SAA. The SAA is only implicated, however, to the extent that the CPUC requires the railroads to use high- strength couplers when exceeding certain trailing tonnage since such couplers are among the safety appliances covered by the SAA. 49 U.S.C. § 20302(a)(1)(A); 49 C.F.R. § 215.123; DOT brief at 9. No such requirement has been imposed, however. Nor have plaintiffs established that regulation of such couplers is necessarily re-

**33.** The union intervenors also argue that the LBIA does not preempt maintenance regulations, relying upon *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149 (9th Cir.1983), in which the Ninth Circuit considered the holding of the Supreme Court in *Southern Railway Co. v. Lunsford*, 297 U.S. 398, 56 S.Ct. 504, 80 L.Ed. 740 (1936). The intervenors contend that *Marshall* recognized that common law negligence claims are not preempted with respect to the maintenance of devices actually attached to the locomotive. The Court is unpersuaded by this reading of the law. The precise holding of *Lunsford* is that because the device on the locomotive which was the subject of a failure-to-maintain claim was "experimental," it was not subject to the absolute liability provision of the BIA

because it was not a "part or appurtenance" of the locomotive within the meaning of the Act. *See Lunsford*, 297 U.S. at 401–02, 56 S.Ct. 504. In adding that experimental devices "have not been excluded from the usual rules relative to liability," *id.* at 402, 56 S.Ct. 504, however, the Court clearly did not hold that such "usual rules" would not be preempted by the BIA; certiorari had not been granted regarding preemption, nor was that issue discussed or even alluded to anywhere in the opinion. To the contrary, the *Marshall* Court itself held squarely that a common law failure-to-attach claim is preempted by the BIA. *See Marshall*, 720 F.2d at 1151–52; *see also Law*, 114 F.3d at 911 (preempting other state common law claims).

quired by any of the CPUC's train make-up rules. Thus, while any regulation of high-strength couplers would be preempted by the SAA, such a challenge is currently premature.

## II. PREEMPTION UNDER THE COMMERCE CLAUSE

■ The Commerce Clause of the United States Constitution (Art. I, § 8, Cl. 3) provides that "The Congress shall have Power .... To regulate Commerce ... among the several States." Under the "dormant Commerce Clause" doctrine, states are, by implication, precluded from unduly interfering with interstate commerce. *See e.g. Healy v. Beer Institute*, 491 U.S. 324, 326, n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). Plaintiffs argue that CPUC's TTD train make-up rules seriously impede interstate commerce. Accordingly, they contend that, to the extent such rules are not already preempted by the FRSA, LBIA, or SAA, this Court should find that they are preempted by the dormant Commerce Clause. As found above, two of the CPUC's train make-up rules—which address the development of performance based train make-up rules and compliance with the railroads' make-up rules—are not preempted by the above statutes. As such, the Court turns to plaintiffs' challenge under the dormant commerce clause.

### A. *Applicability of Dormant Commerce Clause*

As a threshold matter, defendants contend that the two train make-up rules at issue are immune from challenge under the dormant commerce clause. They rightly note that Congress' power to regulate commerce includes the power to specifically authorize states to promulgate rules that unduly burden interstate commerce or otherwise violate commerce clause constraints. *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). In those instances, Congress effectively removes the state regulation at issue from

commerce clause scrutiny. *Id.; Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179, (9th Cir.1998), *cert. denied*, 525 U.S. 1105, 119 S.Ct. 872, 142 L.Ed.2d 773 (1999). Defendants contend that this is such a case because Congress, in enacting the FRSA savings clause, 49 U.S.C. § 20106, expressly authorized states to regulate in areas where there is no federal regulation "covering" the subject area. As such, they argue, the two train make-up rules at issue here—which regulate areas not "covered" by federal regulation and thus are authorized by the FRSA—are exempt from dormant commerce clause analysis.

■ As the Supreme Court has clarified, however, it is not simply a question of whether Congress has permitted the regulation in question. Rather, state regulation is only exempt from commerce clause analysis where Congress has either expressly said so or its intent on this point is "unmistakably clear." *Wunnicke*, 467 U.S. at 91, 104 S.Ct. 2237; *Environmental Technology Council v. Sierra Club*, 98 F.3d 774, 782 (4th Cir.1996). Thus courts have "no authority to rewrite ... legislation based on mere speculation as to what Congress 'probably had in mind.'" *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 393 (3rd Cir.1987) (citation omitted). Congressional intent must be "unambiguous." *id.* and "manifest." *Shamrock Farms*, 146 F.3d at 1180. Requiring such a clear expression of approval "ensures that there is, in fact ... a collective [congressional] decision [to allow burdens on commerce], and reduces significantly the risk that unrepresented interests will be adversely affected by restraints on commerce." *Wunnicke*, 467 U.S. at 92, 104 S.Ct. 2237.

■ In this case, defendants fall short of demonstrating that the FRSA savings clause, 49 U.S.C. § 20106, demonstrates an "unmistakably clear" intent to exempt state regulation in "non-covered" areas from commerce clause scrutiny. First, the FRSA itself contains no express statement or declaration to this effect. Nor does it

explicitly state that "[no] other provision of law" shall interfere with state regulation of non-covered areas, as was the case in *Shamrock Farms,* 146 F.3d at 1180–81 (finding that sweeping statutory language created "blanket exclusion" for California milk standards). On the contrary, the expressed desire for "national[ ] uniform[ity] to the extent practicable," 49 U.S.C. § 20106, suggests a desire to avoid undue burdens on interstate commerce. Nor have defendants identified any unmistakable intent on this issue in the legislative history.

Instead, defendants emphasize that while Congress expressly stated that local safety hazard regulations can "not unreasonably burden interstate commerce," 49 U.S.C. § 20106, it did not explicitly impose this restriction on states that regulate in areas that are not "covered" by the FRSA. *Id.* From this defendants infer that Congress must have consented to unreasonable burdens with respect to the latter type of regulations. While this is one possible inference, it is just that—a possible inference. It is certainly not unmistakably clear that Congress intended to alter the historical practice of subjecting state safety railroad regulations to commerce clause scrutiny. Indeed, Congress may have intended no more than to expressly shift the burden of proof on this issue—which usually rests with the challenger—to the state seeking to regulate under the local safety hazard exception. *See Burlington Northern R.R. Co. v. Dep't of Public Service Regulation,* 763 F.2d 1106, 1109, 1114 (9th Cir.1985) (burden rests with party asserting commerce clause challenge).

*Marshall,* 720 F.2d at 1152–53, further supports this conclusion. There, the Ninth Circuit rejected the argument that the FRSA's savings clause expanded state power to regulate in areas precluded by previous legislation. It concluded instead that "Congress intended to leave unchanged the force and effect of existing federal regulatory statutes." *Id.* at 1153. If Congress did not intend, by way of the FRSA savings clause, to expand state powers into areas previously precluded by statute, it seems even less likely that it intended the clause to affirmatively authorize states to act without regard to constitutional considerations.

As defendants emphasize, one district court has found to the contrary. *See Southern Pacific Transp. v. Public Utilities Comm'n,* 647 F.Supp. 1220 (N.D.Cal.1986), *aff'd,* 820 F.2d 1111 (9th Cir.1987) (holding that state rule authorized under first FRSA savings clause was immune from commerce clause challenge). Upon further reflection, however, this Court declines to rely on this authority because it only considered whether Congress had "authorized" the state rule in question, citing *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), and not whether Congress expressed an "unmistakable intent" to override commerce clause constraints under the later-decided *Wunnicke.* Second, *Southern Pacific Transp.* failed to consider the clear import of the Ninth Circuit's ruling in *Marshall.*[34] Accordingly, the Court turns to plaintiffs' challenge under the Commerce Clause.

### B. *Effect of California's TTD Make-up Rules on Interstate Commerce*

As the Supreme Court has explained:

This Court has adopted what amounts to a two-tiered approach to analyzing state regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor instate economic interests over out- of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce

---

**34.** The Ninth Circuit decision affirming *Southern Pacific Transp.,* did not address the commerce clause; nor was it required to, given that the district court ruled on alternative grounds. Accordingly, defendants' reliance on this affirmance is misplaced.

and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). State laws that fall under the first category are considered per se unconstitutional, while those that fall under the second category are subject to a careful balancing analysis. In these latter cases, the challenger must demonstrate that " "the burden imposed on [interstate] ... commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. 844. In either case, the burden rests with the party asserting the commerce clause challenge to overcome the presumed constitutionality of the state law. *Burlington Northern*, 763 F.2d at 1109, 1114.

In upholding a state law requiring railroads to maintain and staff certain railway freight offices in Montana, the Ninth Circuit expanded upon the balancing of interests that courts must undertake:

> The limits on state regulation of commerce "necessarily [involve] a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664 (1978). Particularly in matters of local concern, the states may regulate commerce even if there is an incidental effect on interstate commerce. *Southern Pacific Co. v. Arizona*, 325 U.S. at 767, 65 S.Ct. at 1519. When the regulation of "matters of local concern is local in character and effect and its impact on the national commerce *does not seriously interfere with* its operation ... such regulation has generally been held to be within state authority." Id. at 767,

65 S.Ct. at 1519; *See Railway Express Agency*, 336 U.S. at 111, 69 S.Ct. at 466 (statute can withstand constitutional attack even if it materially interferes with interstate commerce).

The most cogent argument that the Montana statute burdens commerce is that egregious economic waste adversely affects both railroad operating efficiency and rates paid by the public. While the Commerce Clause does not permit a state to cripple the interstate operations of a common carrier merely to infuse railroad money into the local economy, the record on summary judgment in this case falls short of showing the kind of burden that would justify striking down the statute.

> [Plaintiffs must show that] ... the Montana statute *'impede[s] substantially the free flow of commerce from state to state'* or that the location and staffing of local rail stations, *'because of the need of national uniformity,' can only be regulated by the national government.* *Southern Pacific Co.*, 325 U.S. at 767, 65 S.Ct. at 1519.

*Burlington Northern*, 763 F.2d at 1114 (emphasis added).

Given that maintaining public safety falls within the traditional core of state police powers, it is not surprising that "[m]any decisions by the high court have sustained state and local controls over interstate railroads in the interest of public safety. When the burden on commerce becomes excessive, however, state laws regulating the railroads have been struck down." Antieau & Rich, *Modern Constitutional Law* 2nd. Ed. (1997) at § 43.28. For example, in *Southern Pacific Co. v. Arizona*, 325 U.S. at 770, 773, 775, 65 S.Ct. 1515, the Supreme Court struck an Arizona law restricting train length because it imposed a "serious burden" on interstate commerce, bore "no reasonable relation to safety" and concerned an issue in which uniformity of regulation was "of predominant national concern." Antieau & Rich, at § 43.28.

As found above, two of defendants' train make-up rules are not preempted by either the FRSA, LBIA, or SAA: (1) CPUC's rule requiring plaintiffs to work with CPUC to develop train make up rules, and (2) CPUC's rule requiring defendants to comply with their own train make-up operating rules. With the above principles in mind, each rule is discussed in turn.

### (1) *Rule requiring development of train make-up rules*

Until a generation ago, trains were "commonly made-up in the expectation that they would be reswitched several times in the course of a transcontinental journey. Because of the delays, costs, added personnel requirements, and exposure to accidents that these reswitchings entailed, a concerted effort was instituted to have each origin terminal make the longest possible blocks for its outbound train." Wills Decl. ¶ 44; *see also* Quilty Decl. ¶ 10. Consequently, to the extent possible, plaintiffs now determine the make-up of cars at their place origin so that they can run from the Midwest or Southwest to California without intermediate yard work en route. Wills Decl. ¶ 44; Quilty Decl. ¶ 11. As such, the train make-up rules applicable in any one state, or even to a local site, may often have extraterritorial effects across a number of states.[35]

In this case, CPUC has required that the "[r]ailroads [ ] . . . cooperate and work with Staff and any other interested parties, to develop and implement, subject to Commission approval, performance-based standards for train configurations based on current track-train dynamics principles . . ." Decision at 168, ¶ 1. In articulating the safety rationale for the rule, CPUC states, in part, that "[t]horoughly analyzed TTD rules are essential to the safe operations of modern railroads, particularly in dangerous areas of steep grade and tight curves . . ." *Id.* at 153, ¶ 70. Therefore "rules that govern a railroad's operations which affect track-train dynamics must be developed using sound and current scientific research, and those rules must provide adequate margins of safety according to that research." *Id.* at ¶ 71. Although the rule, on its face is not limited to a particular rail line or location, when read fairly in context with its supporting rationale, it is clear that the rule is intended to apply to 13 of the designated sites. *Id.* at 152, ¶ 63 (TTD regulations are necessary for site Nos. 1, 3, 4, 7, 9, 12, 16, 22, 23, 26, 28, 29, and 31 given incidence of TTD and TTD-related accident causes at those locations).

Given that this rule regulates evenhandedly, and has only indirect effects on interstate commerce, plaintiffs may only overturn it by demonstrating that the "burden on interstate commerce clearly exceeds the local benefits." *Brown–Forman Distillers,* 476 U.S. at 579, 106 S.Ct. 2080; *Burlington Northern,* 763 F.2d at 1114 (plaintiff must show that state law substantially impedes the free flow of commerce from state to state).[36] As discussed below, this Court

---

**35.** For example, site 3 is located on UP's Sunset Route between the Los Angeles Basin and Texas via Arizona; site 28 is located on BNSF's main line from Chicago to the Los Angeles Basin. *See* SEB at site tabs 3, 28.

**36.** Plaintiffs' contention that this rule constitutes a *per se* violation of the dormant commerce clause is not persuasive. They rely on *National Collegiate Athletic Assoc. ("NCAA") v. Miller,* 10 F.3d 633 (9th Cir.1993), in which the Court held that a Nevada statute requiring additional procedural safeguards in enforcement proceedings against Nevada colleges, constituted a *per se* violation of the Commerce Clause. In that case, however, the NCAA had demonstrated that it was *required* to abide by *absolute* national uniformity in enforcement proceedings. There has been no comparable showing in the case at bar; on the contrary, as the record in this case demonstrates, there is not currently *absolute* national uniformity in train make-up standards. Nor is such absolute uniformity even desirable. Indeed, the railroads themselves have balanced the safety interest in having train make-up rules tailored to particular terrain or conditions against the risks and delays associated with the more frequent reconfiguring of trains. In any event, the Supreme Court has observed that "there is no clear line separating the category of state regulation that is virtually per se invalid under the commerce clause, and the category subject to the . . . balancing approach. In

concludes that plaintiffs have satisfied their burden with respect to one subset of the 13 sites but not the other.

CPUC asserts, and plaintiffs do not dispute, that the railroads' own regulations already require specialized train make-up rules for six of those 13 sites. Specifically, the train make up rules at sites 1, 7, 9, 12, 16, and 26 already require "a different set of Train make-up TTD rules from the rules that apply terminal-to-terminal or system-wide, and the rules at each site are different from those imposed by the railroads at the other five sites." King Decl. at ¶ 123; *see also id.* at ¶ 122. These six sites total roughly 80 miles and represent 0.8 percent of total California trackage. *Id.* at ¶ 123.

Given that plaintiffs already have their own distinct train make-up rules for these sites, and thus must already specially reconfigure the trains to accommodate them, plaintiffs have failed to show how developing new, performance-based, make-up standards for these same sites will cause *any* impediment to the free flow of commerce, much less a substantial one. Indeed, given plaintiffs' current use of special train make-up rules for these sites they can hardly argue that a rule calling for just that would materially interfere with or unduly burden interstate commerce. Certainly, plaintiffs have not shown any burden clearly exceeding the state's legitimate interest in advancing railroad safety. Nor can plaintiffs credibly argue that cooperating in an effort to develop performance-based, train make-up rules for these six sites would undermine the need for national uniformity, *Burlington Northern,* 763 F.2d at 1114, since plaintiffs already use differing train make-up rules at each of the six sites. Accordingly, with respect to this subset of sites, plaintiffs have failed to establish any violation of the commerce clause.

With respect to the remaining seven sites—3, 4, 22, 23, 28, 29, and 31—the train make-up rules are the same as the system wide or terminal-to-terminal make-up rules. This important distinction gives rise to serious commerce clause concerns. If California can require the development and implementation of different train make-up rules within the state for sites or lines where uniform make-up rules prevail, then so could every other state. *Southern Pac. Co.,* 325 U.S. at 775, 65 S.Ct. 1515 ("If one state may regulate train lengths, so may all the others"); *see also Healy,* 491 U.S. at 336, 109 S.Ct. 2491 ("the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation"); *South Covington & Cincinnati St. Ry. v. City of Covington,* 235 U.S. 537, 547–48, 35 S.Ct. 158, 59 L.Ed. 350 (1915). As such, plaintiffs could potentially face the specter of having to reconfigure their trains as they crossed each state line. While a certain amount of reconfiguration is clearly in the interests of safety, subjecting plaintiffs to the extensive amount of inconsistent state regulation California's rule would necessarily permit, would undermine the need for substantial uniformity in this area and interfere with interstate commerce. *See e.g.* Suppl. Wills Decl. at ¶ 51.

Moreover, plaintiffs have satisfactorily demonstrated that the potentially serious burdens from allowing states to develop and implement separate train make-up rules where uniform standards prevail, is excessive relative to the putative local benefits. *Pike,* 397 U.S. at 142, 90 S.Ct. 844. As an initial matter, derailments attributed to train make-up constitute "a very small percentage of the total FRA reportable

either situation the critical consideration is the overall effect of the statute on both local

and interstate activity. *Id.*

derailments in the U.S., generally less than 2.0%." Wolf Suppl.Decl. ¶ 16. Nor does California evidence a particular problem in this regard; rather, out of 287 train make-up derailments over the past seven years, only 10 have occurred in California, although California has a relatively high amount of train traffic, rail transportation hubs, and mountainous terrain. *Id.* Of the seven sites at issue, five have experienced no train make-up-related accidents from 1987 – 1997, and the remaining two have experienced one (site 23) and 3 (site 28). *See* SEB at site tabs 3, 4, 22, 23, 28, 29, 31.

There may well of course be instances where the plaintiff can not demonstrate that a state imposed train make-up rule causes excessive interference with commerce relative to the putative local benefits. However, given the record presently before the Court, it concludes that plaintiffs have adequately met their burden in this case. Accordingly, the Court finds that the CPUC rule requiring plaintiffs to assist in developing and implementing performance-based train make up rules for sites 3, 4, 22, 23, 28, 29, and 31 violates the commerce clause.

### (2) *Rule requiring the railroads to comply with their own operating rules*

As described above, CPUC has also required that the railroads comply with their own train make-up rules applicable to the 13 sites identified above. *See* Decision at 169. If violations occur with respect to these specific rules, the CPUC may institute its own enforcement action. Plaintiffs contend that this rule also runs afoul of the commerce clause because if California can enforce the railroads' own operating rules then so can every other state. This leads to the untenable result, plaintiffs argue, of subjecting them to 50 different state enforcement systems. While plaintiffs understandably dislike the specter of being held to their own rules by states, they have failed to demonstrate how it would impede the running of the railroads or interstate commerce.

Plaintiffs rely primarily on a statement in the House Report prepared for the FRSA in which Congress clearly rejected a proposal to have the states enforce federal laws and regulations affecting railway safety. Rather, it concluded that the Secretary of the Department of Transportation should have "exclusive authority to assess and compromise penalties ... and to recommend court action for recovery of such penalties [with respect to federal law] ..." *See* H.R.Rep 941–1194, *reprinted in* 1970 U.S.C.C.A.N. at 4109. While Congress clearly wanted a single, national entity to enforce *federal* railway laws, this statement does not speak to state enforcement of rules governing subject matters that are *not* covered by federal law. Indeed, in this regard, the FRSA savings clause specifically permits states to enforce state rules, like the one at issue here, that address a subject matter not covered by the FRSA. Finally, plaintiffs argue that allowing California, and potentially other states, to enforce the railroads' operating rules would undermine the national uniformity of the rules because each state could interpret the rules differently. This Court agrees with DOT, however, that this argument lacks persuasive force. As masters of their own rules, the railroads can easily clarify any operating rule that gives rise to conflicting interpretations.

### CONCLUSION

In light of all of the foregoing, and good cause appearing, it is HEREBY ORDERED that the parties' motions for summary judgment are granted in part and denied in part as set forth below.

The Court finds that the following rules are preempted by the FRSA, the BIA or the Commerce Clause:

1. Rule requiring the Railroads to cooperate in the development and implementation of performance-based train make-up standards for sites 3, 4, 22, 23, 28, 29, and 31.

2. Rule requiring the Railroads to obtain CPUC approval prior to making changes to track-train dynamic rules.

3. Rule requiring separate training program for train make-up rules.

4. Rule requiring that all trains operating over sites 6 and 25 utilize a two-way end-of-train telemetry device.

5. Rule requiring the Railroads to cooperate in the development and implementation of new standards for dynamic brakes based on total train braking performance criteria.

6. Rule requiring implementation of state-approved locomotive maintenance program.

The Court finds that the following rules are not preempted:

1. Rule requiring the Railroads to cooperate in the development and implementation of performance-based train make-up standards for sites 1, 7, 9, 12, 16, and 26.

2. Rule requiring the Railroads to comply with their own train make-up rules at sites 1, 3, 4, 7, 9, 12, 16, 22, 23, 26, 28, 29, and 31.

3. Rule requiring that at least one hot bearing trackside defect detector ("Hotbox") be installed at site 25.

4. Rule governing track standards at site 9.

The Court FURTHER FINDS that plaintiffs' challenge to the rule regarding train securement procedures is not ripe for review. That claim is dismissed without prejudice consistent with the request of the parties.